UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHELE F. BUCEK,

                                   Plaintiff,

        v.

GALLAGHER BASSETT SERVICES, INC.,

                                   Defendant.

No. 16-CV-1344 (KMK)

<u>OPINION & ORDER</u>

Appearances:

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Carmen J. DiMaria Esq.
Nicole A. Welch, Esq.
Aaron Warshaw, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Michele F. Bucek ("Plaintiff") brought this Action against her former employer,

Gallagher Bassett Services, Inc. ("Defendant" or "GB"), alleging that it failed to promote her

because of her gender, retaliated against her for complaining about it, and paid her less than male

employees, all in violation of the New York Human Rights Law, N.Y. Exec. Law § 296. (Not.

of Removal Ex. A ("Compl.") (Dkt. No. 1).) Before the Court is Defendant's Motion for

Summary Judgment. (Notice of Mot. For Summ. J. (Dkt. No. 22).) For the following reasons,

the Motion is granted.

<u>I. Background</u>

<u>A. Factual Background</u>

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 24)), Plaintiff's response to Defendant's 56.1 statement and counterstatement, (Pl.'s Resp. to Def.'s 56.1 Statement & Counterstatement ("Pl.'s Resp. 56.1" and "Pl.'s Counter-56.1," respectively) (Dkt. No. 30)), and the exhibits submitted by both Parties, and are recounted "in the light most favorable to" Plaintiff, the non-movant. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted).[1] The facts as described below are not in dispute unless indicated otherwise.

<u>1. The Branch Manager Position</u>

Defendant is a third-party administrator of insurance claims handled by various insurance providers. (Def.'s 56.1 ¶ 1.) On April 10, 2006, Plaintiff began working at GB as a Senior Claims Representative, a role in which she worked on workers' compensation insurance claims. (*Id.* ¶¶ 2–3.) Throughout her employment at GB, Plaintiff reported to its Parsippany, New Jersey branch, (*id.* ¶ 4), for "direction and supervision," although she varied between working from home three days a week and full time, (Pl.'s Resp. 56.1 ¶ 4). In October 2012, Plaintiff was promoted to the position of Claims Supervisor. (*Id.* ¶ 5.) In this role, Plaintiff was responsible for supervising a team of Claims Representatives handling workers' compensation claims for GB's clients. (Def.'s 56.1 ¶ 6.) She reported to the Parsippany Branch Manager, who was

---

[1] When citing to Plaintiff's deposition, the Court cites to the full version provided by Defendant on March 8, 2018. (Decl. of Nicole A. Welch, Esq. in Supp. of Def.'s Mot. for Summ. J. Ex. B ("Pl.'s Dep") (Dkt. No. 34).)

initially Dawn Gottschalk and, then, as of 2014, Kenneth Nietzer ("Nietzer"). (Pl.'s Resp. 56.1 ¶ 7.)

Beginning in 2014, GB rolled out certain internal criteria referred to as the "Toolkit." (Def.'s 56.1 ¶ 8.) The Toolkit would monitor the claims system and indicate if certain criteria relating to the claims administration process were being met: if the criteria were timely completed, the Toolkit would show as "green," but if they were not, the Toolkit would show as "red." (*Id.*) Plaintiff admitted that a Claims Supervisor's goal was to have his or her Toolkit in the green—a GB "best practice"—not the red. (*Id.* ¶ 9.) However, the Parties dispute when compliance with the Toolkit became mandatory. Defendant claims that Claims Supervisors were responsible for complying with the Toolkit from the outset of its introduction, while Plaintiff contends that the Toolkit was initially "presented as a guideline, not a requirement," and it only became mandatory in 2015. (*Compare id.* ¶¶ 8–10 *with* Pl.'s Resp. 56.1 ¶¶ 8–10.) Plaintiff also alleges that, when they informed her the Toolkit was mandatory, Branch Managers Gottschalk and Nietzer both also "stated that they did not believe in [the Toolkit] and that it lacked merit." (Pl.'s Resp. 56.1 ¶ 8.)

Through her discussions with Joseph Ryan ("Ryan"), the Northeast Zone Vice President of Operations, it was clear to Plaintiff that maintaining a green Toolkit was of "utmost importance." (Def.'s 56.1 ¶ 10.) However, Plaintiff contends that Ryan did not tell her this until August 2015. (Pl.'s Resp. 56.1 ¶ 10.) And, while it is undisputed that Plaintiff admitted her team's Toolkit was "not looking really good" and that Ryan felt it was a priority to get her team "green," (Def.'s 56.1 ¶ 11), Plaintiff purports that Ryan said this in May 2015 during a personnel review, (Pl.'s Resp. 56.1 ¶ 11.) Prior to May 2015, however, Plaintiff alleges that she advised Ryan of a several impediments to getting her team green: an adjustor had left and the claims

system would not allow other team members to cover that person's assignments; some adjustors had exceeded the maximum number of claims they were permitted to handle and thus could not take further assignments; and the medical-only adjustor was not performing her duties well. (*Id.*) According to Plaintiff, Ryan told her he understood and would get back to her, but only hired a temporary adjustor who was ineffective. (*Id.*)

In January 2015, Nietzer resigned, creating an opening for the Parsippany Branch Manager position. (Def.'s 56.1 ¶ 12.) On February 4, 2015, Plaintiff informed Ryan and Ajay Sinha ("Sinha"), Executive Vice President of U.S. Operations, that she was interested in the position. (*Id.* ¶ 13.) Neither Ryan nor Sinha ever discouraged her from applying. (*Id.* ¶ 15.) On March 10, 2015, Ryan and Sinha conducted a face-to-face interview of Plaintiff. (*Id.* ¶ 14.) Plaintiff contends that, during the interview, both men questioned her about why she wanted to work from the office when she had long worked from home, and spent considerable time accentuating the difference in locale between her prior position and the Branch Manager position. (Pl.'s Resp. 56.1 ¶ 15; Pl.'s Dep. 53.)

James Harrington, who had been a Claims Supervisor in the Parsippany branch for only 18 months, also applied for the Branch Manager position. (Def.'s 56.1 ¶ 16; Pl.'s Resp. 56.1 ¶ 16.) Ryan and Sinha interviewed Harrington in person. (Def.'s 56.1 ¶ 16.) They also interviewed three external candidates, one of which did not perform well in the interview, another of which requested too high a salary, and the third of which was overqualified. (Decl. of E. Joseph Ryan ("Ryan Decl.") ¶¶ 4–5 (Dkt. No. 27).) After the interviews, Ryan selected Harrington for the Branch Manager position. (Def.'s 56.1 ¶ 17.)

The Parties dispute why Ryan selected Harrington instead of Plaintiff. Defendant contends that Ryan "believed Harrington was the best qualified candidate." (*Id.*)[2] Ryan specifically avers that he selected Harrington for three reasons: (1) as Claims Supervisor of the ORCPG account, Harrington transformed the team from "one of the worst performing GBS claims teams in the country" to "one of the best performing" ones; (2) Plaintiff's "team regularly struggled to remain current with the claims they were responsible for processing," and Ryan "knew that . . . [P]laintiff's team was regularly failing to satisfy the Toolkit criteria"; and (3) he "believed Harrington performed better than [P]laintiff during the interviews." (Ryan Decl. ¶¶ 8–10; *see also* Def.'s 56.1 ¶¶ 18–20 (same.).)[3] Ryan thus determined that "Harrington was better qualified for the position because he had the leadership, competency, and skills [they] w[ere] looking for in a Branch Manager." (Def.'s 56.1 ¶ 21 (citing Ryan Decl. ¶ 11).)

Plaintiff disputes these proffered rationales. First, Plaintiff avers that, when Harrington was a Claims Supervisor, she observed a clerk on his team manipulating the claim entries to "make the toolkit green" without actually advancing claim processing. (Pl.'s Resp. 56.1 ¶ 18

---

[2] To the extent that Plaintiff asks the Court to ignore Ryan's declaration, signed under penalty of perjury, that he believed that Harrington was the best qualified candidate, (*see* Pl.'s Resp. 56.1 ¶ 17), the Court declines this request. The Court's task at the summary judgment stage is to determine whether there are disputes of material fact, not to decide which Party's version of events is more credible. Thus, to the extent Ryan's declaration puts forth a fact about Defendant's motivation for not promoting Plaintiff, Plaintiff may dispute that fact, but she may not ask the Court to disregard it merely because "a jury may misbelieve" him. (*Id.*; *see also id.* ¶ 20 ("[A] jury need not believe the self-serving account provided by Ryan.").)

[3] Specifically, Ryan averred that Plaintiff "simply went through the experience in her resume without discussing how she would excel in the Branch Manager position," while "Harrington described in detail how he had turned around the ORCPG account, and how he would use his experience in improving that account to excel in the Branch Manager position." (Ryan Decl. ¶ 10.)

(citing Aff. of Michelle Bucek ("Bucek Aff.") ¶ 10 (Dkt. No. 29)).)[4]  Second, Plaintiff denies that her team's failings were her fault, explaining that the team had been through six supervisors in four years and was poorly performing at the time Plaintiff took over, and that GB was not using the Toolkit when she first started.  (*Id.* ¶ 19 (citing Bucek Aff. ¶ 11).)  Third, Plaintiff claims, for the first time in opposition to the Motion for Summary Judgment, that she *did* discuss more than just her qualifications for the Branch Manager Position in the interview, referencing how she improved the United Airlines team audit score to a 93.7, created tools to expedite claim handling without concurrent quality loss, and her business experience outside of GB.  (*Id.* ¶ 20 (citing Bucek Aff. ¶ 12).)[5]

Plaintiff also argues that, "[o]bjectively, Harrington was not as qualified for leadership in the industry" as Plaintiff because "he had an MBA, but she [had] an MA and an ARM [Associate in Risk Management] which GB paid for."  (*Id.* ¶ 21 (citing Bucek Aff. ¶ 13); *but see id.* ¶ 22 ("Admit that [P]laintiff was not privy to Harrington's resume.").)  However, Plaintiff admitted that Harrington also served as a Claims Supervisor, but she did not know if he was successful in that role, she had "no idea" if Harrington's team improved under his leadership, and "no idea" if Ryan was happy with Harrington's job performance in that leadership role.  (Def.'s 56.1 ¶ 22 (quoting Pl.'s Dep. 172).)  Plaintiff also contends that she was more qualified than Harrington

---

[4] Plaintiff did not mention this at her deposition, even though she was asked why she was more qualified than Harrington for the Branch Manager position.  (Pl.'s Dep. 59–62.)

[5] Plaintiff testified as to "everything" that she remembered being discussed during the interview, but did not mention her work on United Airlines or how she would succeed as Branch Manager.  (Pl.'s Dep. 53–54.)  Thus, to the extent this new statement in Plaintiff's affidavit contradicts her earlier deposition testimony, the Court will disregard it.  *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").

because she had more seniority at GB. (Def.'s 56.1 ¶ 23 (citing Compl. ¶ 14).) But, the Parties dispute whether seniority was a criterion considered in the Branch Manager hiring decision. Ryan avers that seniority was not considered. (Ryan Decl. ¶ 12.) Plaintiff counters that GB never published or announced any specific criteria for the decision. (Pl.'s Resp. 56.1 ¶ 23.)[6] Finally, Plaintiff contends that she was more qualified than Harrington because she had conducted training of Claims Representatives. (Def.'s 56.1 ¶ 24 (citing Compl. ¶ 14).) Defendant claims that previous training experience was not a criterion considered for the Branch Manager position. (Ryan Decl. ¶ 13.) Plaintiff testified that she "didn't recall" if it was, (Def.'s 56.1 ¶ 24 (quoting Pl.'s Dep. 62)), but asserts that such training experience was viewed as a factor supporting her promotion to Claims Supervisor, (Pl.'s Resp. 56.1 ¶ 24; *see also* Pl.'s Counter-56.1 ¶ 14 (listing reasons why Plaintiff was more qualified than Harrington)).

On April 23, 2015, Ryan told Plaintiff over the phone that he was going to announce to staff that Harrington would be the new Branch Manager the following day. (Def.'s 56.1 ¶ 25; Pl.'s Resp. 56.1 ¶ 25.) Defendant contends that Ryan advised Plaintiff he felt Harrington was very qualified for the position, (Def.'s 56.1 ¶ 25), while Plaintiff alleges that Ryan offered "no reason or rationale" to her, (Pl.'s Resp. 56.1 ¶ 25; *see also* Pl.'s Counter-56.1 ¶ 12). Harrington

---

[6] Plaintiff also alleges Nietzer, the person vacating the Branch Manager position, encouraged her to apply for the Branch Manager position, stating "[i]n substance" that because the position "would only relate to worker compensation claims, [P]laintiff would excel in it because of her experience and the respect she had from those working in the branch." (Pl.'s Resp. 56.1 ¶ 23 (citing Bucek Aff. ¶ 14).) As Defendant notes, (Def.'s Reply. 4), this statement—contained only in Plaintiff's affidavit—is inadmissible hearsay, because Nietzer has not provided an affidavit or other sworn testimony in this record. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (explaining that hearsay statements contained within an affidavit cannot be considered at summary judgment). In any event, Nietzer's comments are not relevant to determining whether *Ryan* believed Plaintiff was qualified for the Branch Manager position, particularly because Plaintiff testified that she had no knowledge regarding whether Nietzer recommended her for the position to Ryan. (Pl.'s Dep 57.)

began working as the Branch Manager in April 2015, at which time Plaintiff began to report to him. (Def.'s 56.1 ¶ 26.) Shortly after the formal announcement that Harrington would be the new Branch Manager, Plaintiff called Ryan and told him she felt she hit a "glass ceiling" with the company and did not see any room for advancement. (Def.'s 56.1 ¶ 30; Pl.'s Counter-56.1 ¶ 13.)[7]  At her deposition, the following exchange occurred:

> Q:  What do you mean when you said that you felt you had hit a glass ceiling?
> A:  I meant that through the company of GB, there did not seem to be a clear line of promotion for me since I was at a supervisor and I had not been not promoted to branch manager.  So there were no other opportunities in the claim division from my understanding.
> Q:  So in other words, after supervisor is branch manager?
> A:  Yeah.
> Q:  So if you are not branch manager, there's no other room to move up?
> A:  Not in the claims division.
> Q:  That's what you are referring to when you are referring to glass ceiling, correct?
> A:  Yes.
> Q:  And did you explain that to [Ryan], did you explain what you meant by hitting the glass ceiling?
> A:  Yes, I did.

(Pl.'s Dep. 72–73; *see also* Def.'s 56.1 ¶ 31 (same).)  Further, Plaintiff testified:

> Q:  When you mentioned glass ceiling in the conversation, did you mention glass ceiling with regard to gender or glass ceiling with regard to there was just no place else to move up?
> A:  I did not mention anything about gender.

(Pl.'s Dep. 75; *see also id.* at 169 (saying "[n]o" in response to the question "[w]hen you had that call with [Ryan] when you mentioned glass ceiling, you didn't mention anything about your gender, right?").)  Plaintiff now contends, however, that she understood the phrase "glass

---

[7] To the extent Plaintiff now contends that Plaintiff said this on the call with Ryan when he informally told her he picked Harrington, the day before the formal announcement, (Pl.'s Resp. 56.1 ¶ 25), this allegation is belied by Plaintiff's earlier proclamations.  The Complaint alleges that Plaintiff said this to Ryan "after learning *officially* of Harrington's selection," not on the call with Ryan the day before.  (Compl. ¶¶ 12–13; *see also* Pl.'s Dep. 72 (testifying that Plaintiff said this to Ryan "within 24 hours" of their first call).)

ceiling" to be "a plain reference to gender bias and limitations imposed upon women seeking to advance due to their gender." (Bucek Aff. ¶ 18.) Further, Plaintiff testified about why she felt her gender motivated the decision not to promote her:

> Q: . . . You are saying and your lawsuit is that you were not selected for the branch manager position because of your gender, because you are a woman.
> A: Right.
> Q: And I want you to tell me every fact which you believe supports that conclusion.
> A: Okay. All of the management above me with the exception of Dawn has been male in the GB system. Dawn was hired as a branch manager to do both workers' comp and general liability. Once they split that out so it could be workers' comp versus general liability, I felt that there was an opportunity for me to fit that position because I did not have the general liability experience.
>
> I thought that they were just trying to fill the position with part of the all-boy club and that was the perception that I got when they made that decision to hire. Until they made the announcement of who was going to get the position, I really thought that I had a shot at that. And then once they made the announcement, it just reinforced the all-boy club.
> Q: Okay. So tell me every fact which supports your conclusion that Harrington was hired because it was part of an all-boy club. Tell me every fact.
> A: It's perception. I mean, [Ryan] and [Harrington] would frequently discuss things even when [Harrington] was a supervisor. [Harrington] was not known within the office to be very well received by many people. And he – his demeanor toward women in general was so negative and [Ryan] treated people the same way. They just seemed to click and resonate together. So it made sense that they were going to go with him.

(Pl.'s Dep. 159–161.)[8] Plaintiff also testified to other preferential treatment of men at GB, including that male employees who should have been fired were not fired and female employees were terminated for less serious conduct. (*See* Pl.'s Dep. 162–67.)[9] Plaintiff confirmed that

---

[8] Plaintiff testified that she never complained to anyone that Ryan's or Harrington's "treatment of women was poor because they were women." (Pl.'s Dep. 161.)

[9] Specifically, Plaintiff testified that another male employee, Adam Strong "had been demoted numerous times" and written up for "causing problems," but "was never fired because he was a guy." (Pl.'s Dep. 162.) When pressed as to why this occurred "because he was a guy," Plaintiff testified that she "saw women being fired for less," such as Deb Catoe, who reported to Strong, (*id.* at 162–63), and "at least three or four" other women, (*id.* at 166–67). Plaintiff never complained to anyone that these women were being terminated because of gender discrimination. (*Id.* at 167.) Plaintiff also testified that she recommended the termination of an adjuster that reported to her on the United team, Steve Mangold, because of "blatant

these facts constitute "every fact" that she believes supports her contention that Harrington was selected as Branch Manager instead of her because of her gender.  (*Id.* at 167.)[10]

## 2.  The 2014 Performance Review

Plaintiff received positive performance reviews from 2008 through 2013, and earned Supervisor of the Year awards in 2013 and 2014.  (Pl.'s Counter-56.1 ¶¶ 3–4.)  In her 2013 performance review, Neitzer gave her an "Exceeds [E]xpectations" rating and said Plaintiff was "the strongest supervisor [he] ha[d] in the branch."  (Aff. of Michael H. Sussman in Opp. to Mot. for Summ. J. ("Sussman Aff.") Ex. 1 at 30 (Dkt. No. 31).)  In May 2015, Ryan provided Plaintiff with her performance review for 2014.  (Def.'s 56.1 ¶ 36.)[11]  Ryan gave Plaintiff an overall rating of "Met some, but not all expectations."  (*Id.* ¶ 37.)  The overall summary of Ryan's assessment stated:

> Michele's clients have offered many positive comments throughout the review period.  As discussed, Michele should concentrate on meeting internal initiatives in order to ensure that we are meeting our clients['] expectations.  One area for

---

misconduct"—incurring penalties that exposed the team to liability—but was told by Ryan and Ryan's predecessor that instead Mangold was "being promoted to supervisor in another branch." (*Id.* at 164–65.)  When asked what facts showed that Mangold "was transferred because he was a man instead of [being] fired," Plaintiff said "[i]t was, again, the all-boy club, they wanted to have another guy in that [transferred] branch," but she never heard anyone say that or saw a document to that effect.  (*Id.* at 165–66.)

[10] Plaintiff also testified that, "after [she] saw the pay scales for the various employees" later "showing that the men were being paid more than [she] was, [she] realized that [GB] undervalue[s] women," but that she did not think this had an effect on why she was not selected for the Branch Manager position.  (Pl.'s Dep. 161–62.)

[11] Plaintiff alleges that the evaluation was actually due in March 2015, the month after Nietzer left, and thus a timely review would not have been negative.  (Pl.'s Resp. 56.1 ¶ 36.)  Putting aside that this allegation again relies on Nietzer's hearsay statement, Plaintiff provides no record citation.  Plaintiff also provides no record citation when she makes this assertion in her brief.  (Pl.'s Mem. 7.)  Therefore, the Court will not consider this unsupported allegation.  *See Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) ("[M]any of the factual assertions in Plaintiff's opposition papers either do not contain citations to the record, or are not supported by the citations in the record. The Court disregards all such assertions.").

immediate focus is the Toolkit. Aligned with that, Michele should hold her adjusters accountable for meeting established expectations. By doing so, Michele will be able to concentrate on her management responsibilities. She will then be able to lend further contributions to the branch and Zone.

(Welch Decl. Ex. J ("2014 Performance Review") 1; *see also id.* at 2 (noting that Plaintiff "places her clients['] needs above meeting Toolkit initiatives," which "filter[s] down to her staff who also are not meeting expectations"); *id.* at 4 ("I would like for [Plaintiff] to concentrate on holding her staff accountable. This will allow her to advance her management abilities and focus on reserving and resolution strategy.").) Ryan further noted that Plaintiff "is a valuable member of the management team in Parsippany." (*Id.* at 2.)

Plaintiff disputes the validity of the negative criticism of her team's Toolkit performance, noting that she informed Ryan of impediments to this previously and Ryan was slow to respond to her needs. (Pl.'s Resp. 56.1 ¶ 38 (citing Bucek Aff. ¶ 7).)[12] However, Ryan also discussed the issues with turning the Toolkit green prior to the performance review. (Def.'s 56.1 ¶ 40.)[13] Plaintiff also disagreed with the evaluation in writing, arguing that Ryan relied too heavily on her meeting Toolkit initiatives. (*Id.* ¶ 41.) Nevertheless, Plaintiff did not mention that the evaluation

---

[12] The Performance Review does note that "[o]ne of [Plaintiff's] challenges last year was being overstaffed," which is "being addressed . . . with the new branch manager." (2014 Performance Review 2.)

[13] While Plaintiff contends that she only raised *her* concerns with Ryan about staffing deficiencies before the 2014 Performance review, and that this review was the first time Ryan discussed the priority of the Toolkit, (*see* Pl.'s Resp. 56.1 ¶ 40; Bucek Aff. ¶¶ 7, 19), these allegations contradict her deposition testimony, (*see* Pl.'s Dep. 82 (testifying that she and Ryan previously "had been going over the [T]oolkit numbers because [she] was still missing an adjuster" and so her "team's [T]oolkit was not looking really good" prior to the evaluation); *id.* (noting that Ryan felt that the Toolkit was "of the utmost importance"); *id.* at 92 (testifying "yes" to question of whether she discussed the "issues with turning the [T]oolkit green and having the adjusters do the work and [her] just managing the adjusters . . . prior to the review").)

was in any way discriminatory or retaliatory.  (*Id.*)  Indeed, when asked why she was retaliated

against, Plaintiff testified:

> The fact that I raised the issue with [Ryan] . . . my concerns about the glass ceiling
> and my concerns about my employment and not having a clear career track went
> against the grain with him.  And he decided at that point that things changed.

(Pl.'s Dep. 168; *see also* Def.'s 56.1 ¶ 42 (same).)

After receiving her performance review, Plaintiff had a phone call with Ryan and

Harrington to discuss it, which she recorded without their knowledge.  (Def.'s 56.1 ¶ 43.)[14]

During the call, Ryan discussed the evaluation with Plaintiff and, as he did in the written

evaluation, coached Plaintiff to focus her and her team's concentration on the Toolkit.  (*Id.* ¶ 44.)

Plaintiff did not disagree with Ryan's comments, and did not mention gender discrimination or

retaliation.  (*Id.* ¶ 45; *see also* Performance Review Call at 4:11–15:27.)[15]  Thereafter, Plaintiff

contacted GB Human Resources Vice President Christopher Neigel ("Neigel") to discuss "an

issue" with Ryan and Harrington, stating she wanted guidance from Human Resources.  (Def.'s

56.1 ¶ 46.)  Plaintiff spoke with Neigel on two occasions—once before July 22, 2015, and the

second time on August 10, 2015, in a phone call she recorded, after she met with Ryan and

Harrington in person on August 5, 2015.  (Pl.'s Dep. 103–106; Def.'s 56.1 ¶¶ 55, 58.)  In the first

conversation, Plaintiff told Neigel that she believed that, since Harrington's promotion, Ryan and

Harrington had been condescending towards her, and she felt as though they no longer respected

---

[14] The Court notes that, while the Parties agree that this phone call occurred after Plaintiff received the performance review, it seems that this recording is of Ryan reading Plaintiff his report and then telling her he will give her a copy afterwards.  (*See* Welch Decl. Ex. K ("Performance Review Call") at 4:11–4:45.)

[15] Defendant submitted two audio recordings as an exhibit to its Motion: (1) Plaintiff's phone conversation with Ryan and Harrington, which the Court will call the "Performance Review Call," and (2) Plaintiff's call with Christopher Neigel on August 10, 2015, which the Court will call the "Neigel Call."  (Welch Decl. Ex. K.)  Both recordings cut off before the conversations end.

her because she disagreed with Ryan's comments in her performance review. (Def.'s 56.1 ¶ 47.) She made similar comments in the second, recorded call. (Pl.'s Dep. 104–05; Neigel Call at 0:49–31:02.) At one point during the second, recorded call, Plaintiff said: "from the time that I applied for the branch manager position to now, it seems like they're railroading me. . . . And I don't know whether it's because I'm a woman, is it because they don't like the way I interact with people, is it retaliatory for something I've done? I have no idea." (Neigel Call at 3:10–3:32.)[16] Neigel advised Plaintiff to inform Ryan and Harrington how their tone impacted her, and to let him know the outcome. (*Id.* at 15:18–17:11.) Neigel also assured her Ryan and Harrington would not fire her without talking to him, and know not to retaliate against her, but if they did, she should let him know. (*Id.* at 22:11–23:33.)

Plaintiff then called Ayala Weinstein ("Weinstein") in GB's Human Resources department. (Def.'s 56.1 ¶ 49.) Plaintiff did not mention gender discrimination during this call. (*Id.*) However, she later emailed Weinstein criticizing Harrington's performance as Branch Manager and his unprofessional tone over email. (*Id.* ¶ 50; *see also* Pl.'s Dep. 108 (testifying

---

[16] Plaintiff now contends, for the first time in opposition to the Motion for Summary Judgment, that she told Neigel that "she was concerned about hitting a glass ceiling when she failed to get promoted" and "asked for guidance as to how to proceed within the dictates of HR policy." (Pl.'s Resp. 56.1 ¶ 29; *see also id.* ¶ 47 ("[P]laintiff specifically told Neigel that she believed she had hit the glass ceiling with the company, in her mind a clear reference to gender discrimination.").) However, this new allegation is flatly contradicted by the recording of the second conversation between Neigel and Plaintiff, (*see* Neigel Call at 0:49–31:02 ), and her deposition testimony regarding both conversations, (Pl.'s Dep. at 103–105 (testifying to contents of call with Neigel and stating that there is nothing else she recalls that they discussed); *id.* at 134–35 (testifying that the recording is accurate and explaining that the evaluation was "too coincidental" after her comment to *Ryan* about the glass ceiling for promotion opportunities).) The Court therefore will not consider this new factual allegation. *See Brown*, 257 F.3d at 252 (refusing to consider factual allegations that contradict prior deposition testimony); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

that she was complaining about "Harrington's performance as Branch Manager").)   Plaintiff

testified, however, that there were other "issues" not in this email, including that Ryan's

demeanor toward Plaintiff changed after she informed him of her "concerns about not being

promoted" and "about the glass ceiling." (Pl.'s Dep. 107.)   Again, the Parties dispute whether

"the glass ceiling" refers to gender.  (*Compare* Def.'s 56.1 ¶ 52 *with* Pl.'s Resp. 56.1 ¶ 52.)

### 3.  Salary Differentials

#### a.  2015 Salary Increase

Because she received a "Met some, not all expectations" performance rating, Plaintiff

was ineligible for a salary increase.  (Def.'s 56.1 ¶ 53.)  However, Harrington got Ryan to "waive

this mandate due to the extra work [Plaintiff had] been putting in while there were vacancies on

[her] team."  (Welch Decl. Ex. M at 2 (email from Harrington to Plaintiff on July 27, 2015).)

Plaintiff thus received a 1.9% salary increase.  (Def.'s 56.1 ¶ 54.)  Plaintiff emailed Harrington

back on July 30, 2015 stating that she was "very disappointed in the amount of [her] increase"

and wanted to discuss it in person.  (Welch Decl. Ex. M at 1.)  Harrington then emailed Ryan, "I

can discuss with [Plaintiff], but wanted to also extend invite to you if you'd like to be involved."

(Welch Decl. Ex. M. at 1.)

On August 5, 2014, Plaintiff met with Ryan and Harrington to discuss her salary increase.

(Def.'s 56.1 ¶ 55.)  Even though she understood that maintaining a green Toolkit was of "utmost

importance" to Ryan, Plaintiff told him she believed her performance review was unfair because

in her mind, other facets of the job were more important.  (*Id.* ¶ 56.)  Ryan said he stood behind

his comments in the evaluation, he was not going to change them, and Plaintiff should do

everything she could to get her team's Toolkit green.  (*Id.*)[17]  Plaintiff also noted that she was

still short-staffed.  (Pl.'s Counter-56.1 ¶ 22.)  Following that meeting, Plaintiff again contacted

Neigel on August 10, 2015, and recorded this call without Neigel's knowledge.  (Def.'s 56.1

¶ 58.)  Plaintiff did not complain that she was discriminated against because of her gender on this

call.  (*Id.* ¶ 59 (citing Neigel Call).)

On August 26, 2015, Plaintiff accepted a job offer from a company named Strategic

Comp.  (*Id.* ¶ 60.)  The annual salary for this job was $93,500—approximately $20,000 more

than she was making at GB.  (*Id.* ¶ 61.)  Plaintiff emailed her resignation to GB on September 3,

2015, stating that she was leaving because she received an offer from another company.  (*Id.*

¶ 62.)  At no time did Plaintiff say she was leaving GB because she believed she was being

discriminated or retaliated against, nor had anyone at GB ever told Plaintiff she was in danger of

being terminated or that they did not want her to work there anymore.  (*Id.*)  However, Plaintiff

avers that she resigned because of her failed promotion, diminished performance reviews,

increasing criticisms of her leadership capacity, continued under-staffing of her team, and her

belief that she had limited opportunities for growth at GB.  (Pl.'s Counter-56.1 ¶ 23.)

### b.  Claims Supervisors' Salaries

After Harrington became Branch Manager, Plaintiff "got access to [Adam Strong's]

wages."  (Pl.'s Dep. 187; *see also id.* at 174, 189 (same).)   Strong was a Claims Supervisor for

two or three years, until 2013, when he was demoted to a Claims Representative and began

reporting to Plaintiff.  (Def.'s 56.1 ¶¶ 66–67.)  Strong had a higher salary than Plaintiff before he

---

[17] Plaintiff memorialized what was said during this meeting in a draft email that she never
sent.  (Welch Decl. Ex. N.)  Defendant contends that this email shows Plaintiff did not mention
her gender or discrimination during the meeting.  (Def.'s 56.1 ¶ 57.)  Plaintiff denies "any
saliency" to this exhibit.  (Pl.'s Resp. 56.1 ¶ 57.)

was demoted, but not after. (*Id.* ¶ 68.) Specifically, as a supervisor, Strong earned up to approximately $83,000 (Sussman Aff. Ex. 6 at 2 (Strong's salary history showing he was hired at a salary of $81,999.96 and he got a merit-based raise to $82,999.92 in 2012); Neigel Decl. ¶ 4 (showing drop from $83,000 salary in 2012 to $77,000 in 2013 "prior to changing titles" for Strong).) By contrast, Plaintiff's salary as a Claims Supervisor "maxed out at $78,830 after three years in that job title." (Bucek Aff. ¶ 22; *see also* Pl.'s Counter-56.1 ¶¶ 27–30 (describing salary differentials in Claim Supervisor positions in 2012 and 2013).) When asked for "every reason" why Plaintiff believed Strong was paid more than her because of her gender, Plaintiff testified that she "s[aw] no other reason," because she was "more qualified than he was," "nobody liked him," and he was "consistently demoted." (Pl.'s Dep. 186.) Specifically for the period while she was a supervisor, Plaintiff explained;

> A: As I said, I have no other rationale for it.
> B: Just because he's a man and you're a woman?
> A: Yes.

(*Id.* at 189.)

Although Plaintiff testified that her salary-based gender discrimination claim was solely based on the comparison between her salary and Strong's salary, (Def.'s 56.1 ¶ 63 (citing Pl.'s Dep. 188–89)), she now points to other GB employees who were paid more than her as claims supervisors in Parsippany, (Pl.'s Counter-56.1 ¶¶ 35–49). In 2012, Stephen Barron earned $85,000, Dennis McCarthy earned $78,000, and William McComb earned $80,000, all as supervisors, while Plaintiff—in her first year as a Claims Supervisor—earned $68,000. (*Id.* ¶¶ 36, 41, 49 (citing Neigel Decl. ¶ 4).)[18] In 2013, Barron earned $86,700, McComb earned

---

[18] Plaintiff alleges that Stephen Barron was the highest paid Claim Supervisor in 2012, but the cited chart shows that a female, Magali Chang, earned $1500 more than him that year. (Neigel Decl. ¶ 4.)

$81,000, and Harrington, in his first year as a supervisor, earned $85,000, while Plaintiff earned $74,000. (*Id.* ¶¶ 37, 39, 49 (citing Neigel Decl. ¶ 4).) In 2014, Barron earned $86,700, Harrington earned $85,000, McComb earned $82,053, and Terrence Nash and Jeffrey Daniels, both of whom started working as supervisors that year, earned $80,000 and $83,000, respectively, while Plaintiff earned $77,330. (*Id.* ¶¶ 38, 40, 43, 45, 49 (citing Neigel Decl. ¶ 4).) Finally, in 2015, McComb earned $82,053 and James Adair, in his first year as a supervisor, earned $85,000, while Plaintiff earned $78,830. (*Id.* ¶¶ 47–49 (citing Neigel Decl.).)

Plaintiff did not know the salaries of any of the other Claims Supervisors, including whether any female Claims Supervisors made more than she did or more than any male Claims Supervisors. (Def.'s 56.1 ¶ 71.) In fact, each year from 2012 through 2015, the highest paid Claims Supervisor in Parsippany was female. (*See* Neigel Decl. ¶ 4 (salary for Magali Chang through 2014 and salary for Erica Levesque in 2015).) Throughout her tenure as a Claims Supervisor, Plaintiff was regularly the lowest paid one, making less than both male and female Claims Supervisors. (Def.'s 56.1 ¶ 72 (citing Neigel Decl. ¶ 4).) In February 2013, when Plaintiff sought a pay increase, (Pl.'s Counter-56.1 ¶ 31), Vice President of Claims operation at GB, Matt Plessinger, recommended the increase to Sinha, noting that Plaintiff "is currently making $68,000," while "[t]he other Supervisor working on the United program is currently making $77,000," and the other "Supervisor[']s salaries in the branch are $85,000, $83,000, $85,000, $80,000 and $82,500," making Plaintiff's salary "much lower than the rest of the other supervisors." (Sussman Aff. Ex. 5.) Sinha agreed that Plaintiff's "current salary is well below other supervisors and low for Parsippany" and recommended a $3,000 salary increase. (*Id.*)

### 4.  GB Policies

GB has an anti-discrimination policy which prohibits discrimination based upon gender/sex, and a policy prohibiting retaliation against any employee who complains about workplace discrimination.  (Def.'s 56.1 ¶¶ 27–28.)  The policies further provide that any employee who believes they are being discriminated or retaliated against must report that conduct to GB.  (*Id.* ¶ 28.)  As a GB employee, Plaintiff had access to these policies.  (*Id.* ¶ 27.)  Plaintiff testified that she knew she had a duty to complain under these policies.  (Pl.'s Dep. 203.)  However, she claims her supervisors never indicated that she needed to review these policies or that she must comply with them or be barred from filing a federal gender discrimination lawsuit.  (Pl.'s Resp. 56.1 ¶ 27.)  Plaintiff never complained about discrimination to GB.  (Def.'s 56.1 ¶ 29 (citing Pl.'s Dep. 203 (testifying that she "did not" complain)).)  Plaintiff contends that she only failed to file "a formal complaint," but her "glass ceiling" comment to Ryan could be construed as a complaint.  (Pl.'s Resp. 56.1 ¶ 29; Pl.'s Mem. of Law in Opp. to Mot. For Summ. J. ("Pl.'s Mem.") (Dkt. No. 28) 6, 15.)  But, putting aside whether her comment could constitute a complaint, GB's policy does not require a *formal* complaint: it states that employees may complain to a manager, someone in HR, or to the company's ethics and compliance hotline, even anonymously, *or* they could file a formal charge of discrimination with a federal, state, or local employment practices agency.  (Welch Decl. Ex. I ("GB Discrimination Policy") at 2.1.)

### B.  Procedural History

Plaintiff commenced this Action on January 14, 2016 by filing the Complaint in New York Supreme Court, County of Orange.  (Compl.)  Defendant removed the Action to federal court on February 22, 2016.  (Not. of Removal.)  After receiving an extension of time, (Dkt. No.

6), Defendant filed its Answer on March 14, 2016 (Answer and Aff. Defenses (Dkt. No. 10)). Court mediation was held but unsuccessful. (Dkt. No. 13.) On July 15, 2016, the Court adopted the Parties' joint proposed discovery schedule. (Dkt. No. 16.)

On April 25, 2017, Defendant filed a pre-motion letter indicating the grounds on which it would move for summary judgment. (Letter from Carmen J. DiMaria, Esq. to Court (Apr. 25, 2017) (Dkt. No. 17).) Plaintiff responded, arguing that Defendant's proposed motion lacked merit. (Letter from Michael H. Sussman, Esq. to Court (May 8, 2017) (Dkt. No. 19).) The Court then held a conference on May 10, 2017 and adopted a briefing schedule. (*See* Dkt. (entry for May 10, 2017); Mot. Scheduling Order (Dkt. No. 21).) Defendant filed the instant Motion for Summary Judgment and supporting papers on June 23, 2017. (Not. of Mot. For Summ J.; Mem. of Law in Supp. of Mot. For Summ. J. ("Def.'s Mem.") (Dkt. No. 23); Def.'s 56.1; Dkt. Nos. 25–27 (declarations with exhibits in support of the Motion).) Plaintiff filed an opposition and accompanying papers on July 20, 2017. (Pl.'s Mem; Bucek Aff.; Pl.'s 56.1; Sussman Aff.) On August 15, 2017, Defendant filed a Reply and a Reply Affirmation containing more excerpts of Plaintiff's deposition. (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Reply") (Dkt. No. 32); Reply Decl. of Nicole A. Welch, Esq. in Further Supp. of Mot. for Summ. J. ("Welch Reply Decl.") (Dkt. No. 33).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. at 521 (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

Plaintiff claims that Defendant violated the New York State Human Rights Law ("NYSHRL") by failing to promote her to Branch Manager, by retaliating against her for complaining about that alleged discrimination in the form of an unsatisfactory performance review, and by paying her less than similarly situated male employees. (*See generally Compl.*) *See* N.Y. Exec. Law § 296(1)(a), (e). All of these claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims are reviewed under the burden-shifting approach of McDonnell Douglas.");

*Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) ("[T]he Second Circuit

analyzes claims pursuant to NYSHRL under the familiar three-part framework set forth by the

Supreme Court in *McDonnell Douglas*.")

> Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a
> preponderance of the evidence a prima facie case of discrimination; it is then the
> defendant's burden to proffer a legitimate non-discriminatory reason for its actions;
> the final and ultimate burden is on the plaintiff to establish that the defendant's
> reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). "While summary judgment

must be granted with caution in employment discrimination actions, it remains available to reject

discrimination claims in cases lacking genuine issues of material fact. Thus, even in the

discrimination context, a plaintiff must prove more than conclusory allegations of discrimination

to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d

289, 302 (S.D.N.Y. 2009) (citations and internal quotation marks omitted).

### 1. Failure to Promote

The NYSHRL prohibits an employer from refusing to hire or to discriminate against an

individual "in compensation or in terms, conditions, or privileges of employment." N.Y. Exec.

Law § 296(1)(a). Plaintiff claims that Defendant failed to select her for the Branch Manager

position because of her gender, and instead selected Harrington, a less qualified male candidate.

(Compl. ¶¶ 4–16; Pl.'s Mem. 13–15.) Defendant argues that Plaintiff failed to establish a prima

facie case of gender discrimination or pretext. (Def.'s Mem. 13–17.)

Even assuming Plaintiff has satisfied a prima facie case of gender discrimination because

she was a qualified female candidate who lost the job to a male candidate, *see Aspilaire*, 612 F.

Supp. 2d at 301 (setting forth elements of prima facie case); *Idrees v. City of New York*, No. 04-

CV-2197, 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) ("Second Circuit case law makes

clear that a court may simply assume that a plaintiff has established a prima facie case and skip

to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a

legitimate nondiscriminatory reason for the adverse employment action."), Plaintiff fails to raise

a dispute of material fact as to whether Ryan's non-discriminatory reasons for choosing

Harrington were a pretext for gender discrimination.  As an initial matter, Ryan proffered

legitimate, non-discriminatory reasons for choosing Harrington: he believed Harrington was

more qualified based upon Harrington's success as a Claims Supervisor, Plaintiff's team

struggled to remain current with claim processing and to satisfy the Toolkit criteria, and

Harrington performed better in the interviews.  (Ryan Decl. ¶¶ 8–10.)  This is sufficient evidence

to satisfy Defendant's burden at step two of *McDonnell Douglas*.  *See Meiri v. Dacon*, 759 F.2d

989, 997 (2d Cir. 1985) (holding that "the employer's explanation of its reasons must be clear

and specific"); *see also Mandell v. Cty. of Suffolk*, 316 F.3d 368, 380 (2d Cir. 2003) (finding that

the employer proffered sufficient evidence of legitimate reasons not to promote the plaintiff

through supervisor's testimony that he found the other candidate more qualified and got a

negative impression of the plaintiff in an interview); *Aspilaire*, 612 F. Supp. 2d at 306–07

(finding employer's belief that another candidate "was the most qualified applicant for the job

based on [their] experience" and concerns about the plaintiff's work were sufficient legitimate,

non-discriminatory reasons for not promoting the plaintiff).

Indeed, Plaintiff does not contest that Defendant satisfied this burden; rather, she

contends that these reasons were pretextual.  (Pl.'s Mem. 14–15.)  To establish pretext, Plaintiff

may show that Defendant's proffered justifications are "false," or she "may instead rely on

evidence—circumstantial or otherwise—showing that [her gender] was a motivating factor" in

the decision to hire Harrington instead of Plaintiff.  *Holtz v. Rockefeller & Co., Inc.* 258 F.3d 62,

81 (2d Cir. 2001) (citations and internal quotation marks omitted); *see also Ya-Chen Chen v. City Univ. of New York*, No. 11-CV-320, 2014 WL 1285595, at *7 (S.D.N.Y. Mar. 31, 2014) ("To establish pretext, the plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." (alterations and internal quotation marks omitted)), *aff'd*, 805 F.3d 59 (2d Cir. 2015). Although she identifies several facts she believes are disputed, Plaintiff has not satisfied this standard.[19]

Plaintiff first argues that Nietzer, the former Branch Manager, encouraged her to apply to replace him because of her experience and reputation in the branch. (Pl.'s Mem. 14.) As the Court noted earlier, this statement by Nietzer, contained in Plaintiff's affidavit, is inadmissible hearsay and the Court will not consider it at summary judgment. (*See supra* n.5.)[20] In any event, Nietzer's comments are not relevant to determining whether *Ryan*, the person who committed the purportedly discriminatory act, believed Plaintiff was qualified for the Branch Manager position. Indeed, Plaintiff testified that she had no knowledge regarding whether Nietzer recommended her for the position to Ryan. (Pl.'s Dep 57.)

Plaintiff next contends, for the first time in opposition to the Motion for Summary Judgment, that a clerk on Harrington's team manipulated the toolkit to make it look green.

---

[19] The Court also notes that Plaintiff has failed to provide *any* record citations in this section of her brief, and the Court could therefore disregard her unsupported assertions. *See Berry*, 137 F. Supp. 3d at 502 n.1.

[20] Plaintiff also attempts to dispute Ryan's description of his interview of Plaintiff, claiming that she *did* discuss her qualifications for the Branch Manager Position, including her improvement of the United Airlines team audit score, her expedition of claim handling, and her business experience outside of GB. (Pl.'s Mem. 14; Bucek Aff. ¶ 12.) But, as previously noted, the Court will not permit Plaintiff to manufacture a dispute of fact via affidavit that contradicts her earlier deposition testimony—that she testified to "everything" she remembered being discussed during the interview, which did not include any of these issues. (*See supra* n.4.)

(Bucek Aff. ¶ 10; Pl.'s Mem. 14.)  But, Plaintiff previously testified that she "wouldn't know" whether Harrington was successful as a Claim Supervisor.  (Pl.'s Dep 59.)   The Court thus finds specious Plaintiff's new contention.  *See Brown*, 257 F.3d at 252 (rejecting factual allegations made for the first time in an affidavit opposing summary judgment that contradicts prior deposition testimony).  In any event, this fact is not material, because, even assuming Harrington was not actually a successful Claims Supervisor or that he had a clerk manipulate the Toolkit, there are no facts in this record indicating Ryan *knew* any of this when he hired Harrington such that Ryan's reasoning was pretextual.  Indeed, it is undisputed that as a Claims Supervisor, Harrington transformed his team from "one of the worst performing GBS claims teams in the country" to "one of the best performing" ones.  (Ryan Decl. ¶ 8.)

It is also undisputed that Plaintiff's team regularly failed to satisfy the Toolkit criteria, Ryan's second proffered rationale for choosing Harrington.  (Ryan Decl. ¶ 9; Def.'s 56.1 ¶ 11.) Plaintiff argues that a "2013 appraisal demonstrates that her unit had substantially progressed and a jury could understand her failure to make more progress as a reflection on being understaffed," rather than "her capabilities."  (Pl.'s Mem. 14.)  Plaintiff provides no record citation, but the Court assumes Plaintiff is referring to Plaintiff's 2013 "[e]xceeds expectations" performance review by Nietzer.  (Sussman Aff. Ex. 1 at 30.)  This fact, however, is not material, because it is undisputed that the Toolkit was rolled out in 2014, (Def's 56.1 ¶ 8), after this performance review and before the Branch Manager hiring decision, (*id.* ¶ 25).  Furthermore, even assuming that the poor Toolkit performance is a product of understaffing, not Plaintiff's abilities, Plaintiff's subjective disagreement with Ryan's reliance on this factor does not make it discriminatory.  *See Concepcion v. City of New York*, No. 15-CV-2156, 2016 WL 386099, at *14 (S.D.N.Y. Jan. 29, 2016) ("[Plaintiff's] subjective assessment of her own qualifications is

insufficient to create a genuine factual issue as to whether the [defendant's] proffered reason for its hiring decisions are pretext for discrimination."), *aff'd*, 693 F. App'x 31 (2d Cir. 2017); *Estrada v. Lehman Bros.*, No. 99-CV-8559, 2001 WL 43605, at *5 (S.D.N.Y. Jan. 18, 2001) ("The mere fact that [the plaintiff] may disagree with his employer's actions or think that his behavior was justified does not raise an inference of pretext."). Indeed, although it is disputed when the Toolkit became mandatory, (*compare* Def.'s 56.1 ¶¶ 8–10 *with* Pl.'s Resp. 56.1 ¶¶ 8–10), and when Ryan told Plaintiff about the importance of the Toolkit, (Def's 56.1 ¶ 11; Pl.'s Resp. 56.1 ¶ 11), it is *undisputed* that it was an important metric for judging teams at GB since 2014, (Def.'s 56.1 ¶¶ 8–11; Pl.'s Dep. 61).)

Construing the facts in the light most favorable to Plaintiff, she may be arguing that Ryan was aware of her team's understaffing—at some point "[b]efore May 2015," (Bucek Aff. ¶ 7)— and its effect on the Toolkit, and thus his reliance on this metric to find Plaintiff less qualified than Harrington was pretextual.[21] As an initial matter, Plaintiff does not allege that Ryan was aware of this understaffing *before* he made the decision to hire Harrington, after the interviews in early March 2015—a fact crucial to determining whether the weight he assigned to the Toolkit in his hiring decision was justifiable. (Def.'s 56.1 ¶¶ 14, 17.) And, Plaintiff avers that Ryan hired a temporary adjustor from another agency to aid Plaintiff's team after she informed him of these issues, "[i]n the spring [of] 2015," although he was ineffective. (Buceck Aff. ¶ 7.) Plaintiff does not, however, allege that Ryan knew the adjustor was ineffective at all, let alone before he made the Branch Manager hiring decision. Absent such facts, it would be impossible for a reasonable

---

[21] However, Plaintiff, who is counseled, does not clearly make this argument or make any attempt to refer to these portions of the record. *See Holtz*, 258 F.3d at 73 (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention).

fact-finder to infer that Ryan inappropriately relied on the Toolkit factor while knowing it was not actually Plaintiff's fault.  In any event, even if his reliance on the Toolkit was dubious, Ryan's decision was based on other proffered reasons which Plaintiff has not shown to be false or gender-based, as explained above.  *E.g.*, *Templeton v. Veterans Admin.*, 540 F. Supp. 695, 698 (S.D.N.Y. 1982) (dismissing discrimination complaint where the plaintiff did not deny the existence of the other factors on which his dismissal was based and even the additional asserted factor "was work related").  And, Plaintiff cites no facts suggesting this reliance on the Toolkit was based on her *gender*, such that the other reasons do not shield a finding of pretext.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding that "rejection of the defendant's proffered reasons [does not] compel[] judgment for the plaintiff" because the plaintiff "at all times bears the ultimate burden of persuasion" that the decision was intentionally discriminatory (internal quotation marks omitted)); *id.* at 524 ("That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of [gender] is correct."); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129 (2d Cir. 2013) (requiring the plaintiff "to point to evidence suggesting that *discriminatory animus* was a motivating factor").  Ultimately, this is not a case in which "a reasonable jury could conclude that" Ryan's decision to hire Harrington "was so lacking in merit as to call into question its genuineness" merely because it relied on the Toolkit.  *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988); *see also Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986) ("[T]he reasons for hiring [another candidate] were not so ridden with error that [the employer] could not have honestly relied upon them.").

Finally, Plaintiff argues that the passing over a qualified female candidate for a male candidate alone—in other words, her prima facie case—shows discrimination.  (Pl.'s Mem. 14.)

But, there is no evidence in the record regarding the gender of the other three rejected candidates for the Branch Manager Position. (Ryan Decl. ¶ 4.) Moreover, again, merely asserting her subjective belief that she is more qualified than Harrington, without any evidence showing she was clearly more qualified than him, is insufficient to show that gender played a motivating role in the decision to hire Harrington. *See Byrnie v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (explaining that, to defeat summary judgment, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person . . . could have chosen the candidate selected over the plaintiff for the job in question" (internal quotation marks omitted)); *see also Wharff v. State Univ of New York*, 413 F. App'x 406, 408 (2d Cir. 2011) ("[W]here a decision to promote one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn." (alterations and internal quotation marks omitted)). This is particularly so where the qualifications Plaintiff allegedly has over Harrington—seniority, training experience, and an ARM degree, (Bucek Aff. ¶ 13; Def.'s 56.1 ¶¶ 23–24)—were not requirements for the job, which had no announced criteria. (Pl.'s Resp. 56.1 ¶ 23). In sum, Ryan made a business judgment that Harrington was a better candidate than Plaintiff, and, absent evidence that that decision was motivated even in part because of Plaintiff's gender, the Court should not substitute its own judgment for Ryan's. *See Byrnie,* 243 F.3d at 103 (noting that where the other candidate was not unqualified and the employer was not unreasonable in selecting that candidate "in light of a comparison of her paper credentials with [the plaintiff's]," the plaintiff failed to show pretext); *Newsome v. IDB Capital Corp*., No. 13-CV-6576, 2016 WL 1254393, at *22 (S.D.N.Y. Mar. 28, 2016) ("At their heart, [the] [p]laintiffs' claims reflect their disagreement with the [d]efendants' business judgments and assessments of

the quality of their work or reflect the [p]laintiffs' subjective feelings and perceptions that they were being discriminated against because of their . . . gender.  Such claims are, however, insufficient to establish discrimination."); *Sattar v. Johnson*, No. 12-CV-7828, 2015 WL 5439064, at *12 (S.D.N.Y. Sept. 11, 2015) ("To fault the [employer] for selecting [another candidate] over [the plaintiff] would improperly require the factfinder to act as a 'super personnel department,' second-guessing the merits of the [employer's] decision to select [the other candidate] for the position over [the plaintiff]" (internal quotation marks omitted)); *see also Smith v. Ward Leonard Elec. Co.*, No. 00-CV-3703, 2004 WL 1661098, at *9 (S.D.N.Y. July 23, 2004) (holding that the plaintiff could not establish pretext "on his weak prima facie case alone").

Plaintiff points to no other facts creating a material dispute regarding whether Ryan's reasons for hiring Harrington are pretextual.  (*See* Pl.'s Mem. 14.)  Thus, the Court's analysis of this claim could end here.  *See Gonzalez v. K-Mart Corp.*, 585 F. Supp. 2d 501, 503 (S.D.N.Y. 2008) ("[J]udges are not like pigs, hunting for truffles buried in the record."  (internal quotation marks omitted)).  However, the Court will briefly address other arguments, although not raised, before dismissing Plaintiff's failure to promote claim.  When asked for "every fact" showing why the decision not to hire her was based on her gender, Plaintiff testified that (1) all of the management above her, except "Dawn," was male at GB and (2) her "perception" was that, by choosing Harrington, they "were just trying to fill the position with part of the all-boy club." (Pl.'s Dep. 159–61.)  The first fact alone does not show the decision to hire Harrington was motivated in part by Plaintiff's gender.  The only management position above Plaintiff was the Branch Manager, (*id.* at 73), and Dawn, a female, had served in that role, (*id.* at 34–36).  Plaintiff presents no evidence that other females applied for the Branch Manager Position or that they

were passed over for male candidates. Indeed, she testified that "the great majority" of supervisors at GB were women. (*Id.* at 163.) Thus, this claim amounts to an assertion that because a male made the decision to hire another male over a female, it was discriminatory. That is not the law. *See, e.g.*, *Gumbs v. Hall*, 51 F. Supp. 2d 275, 280 (W.D.N.Y. 1999) (noting that the fact that "a white male . . . chose another white male for the Vice President position . . . is not enough" to show discrimination), *aff'd*, 205 F.3d 1323 (2d Cir. 2000).

Plaintiff's second proposed fact—her perception of an all-boys club at GB—merits closer scrutiny. Based on Plaintiff's testimony, it is not clear whether she had this perception "when they made th[e] decision to hire" Harrington, or beforehand, and the decision "just reinforced the all-boy club." (Pl.'s Dep. 160.) In any event, Plaintiff testified that this perception was based on several facts: (1) Ryan and Harrington frequently talked even when Harrington was a Claims Supervisor; (2) Harrington was not "very well received by many people" in the office; (3) Ryan and Harrington both portrayed a negative "demeanor toward women." (*Id.* at 160–61.) As to Ryan's and Harrington's alleged comradery prior to the Branch Manager interviews, Plaintiff alleges that they acted similarly and "just seemed to click and resonate together," and thus "it made sense that" Ryan would hire Harrington. (Pl.'s Dep. 161.) But, while perhaps demonstrative of Ryan's personal bias in favor of Harrington, this friendship alone does not establish that such bias was based on *gender*. *See, e.g.*, *Ricketts v. Ashcroft*, No. 00-CV-1557, 2003 WL 1212618, at *7 (S.D.N.Y. Mar. 17, 2003) (finding allegation that the employer's "white male employees maintained a telephonic 'buddy system' by which friendly calls were placed to . . . management on behalf of white men being considered for promotions" insufficient to show discrimination); *Lapsley v. Columbia Univ.-College of Physicians & Surgeons*, 999 F. Supp. 506, 523 n. 15 (S.D.N.Y. 1998) ("Discrimination does not lurk behind every inaccurate

statement.  Instead, the pretext may mask some other unbecoming, albeit legal, motivation, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." (alteration and internal quotation marks omitted)); *see also Farrell v. Butler Univ.*, 421 F.3d 609, 615 (7th Cir. 2005) (finding the plaintiff's "assertions of an 'old boys' club'" did not show pretext because the evidence showed, among other things, only that a recommender and an award candidate "were lunch-time companions" and another recommender knew of an award candidate's "home life").

Moreover, Plaintiff's mere perception of gender bias or a "boys club" atmosphere is insufficient to show pretext.  *See Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 309 (E.D.N.Y. 2014) ("[A] plaintiff's mere subjective belief that [s]he was discriminated against because of h[er] [gender] does not sustain a . . . discrimination claim" (internal quotation marks omitted)), *aff'd*, 594 F. App'x 29 (2d Cir. 2015); *Watson v. Geithner*, No. 09-CV-6624, 2013 WL 5420932, at *9 (S.D.N.Y. Sept. 27, 2013) (explaining that the plaintiff's "belief, based on no evidence other than gut instinct that her supervisor treated her with hostility because of her . . . gender . . . cannot justifiably support an inference of discrimination when nothing in the record remotely links the supervisor's treatment of [the] plaintiff to her . . . gender . . ." (alterations and internal quotation marks omitted)); *Padob v. Entex Info. Serv.*, 960 F. Supp. 806, 813 (S.D.N.Y. 1997) ("In her deposition, [the] [p]laintiff stated in a conclusory fashion that she was thus excluded because she is a woman.  When pressed, Plaintiff continually stated that she felt this was due to the fact that she was the only woman.  However, the fact of her being the only woman . . . in her position, standing alone, does not create a genuine issue of material fact as to pretext based on gender."); *see also Raby v. Westside Transit*, No. 03-CV-1000, 2006 WL 1877000, at *6 (E.D. La. June 16, 2006) (holding that the plaintiff's assertion of "the existence of a 'boys

club,'" without more, was insufficient to raise a dispute of fact as to pretext), *aff'd*, 224 F. App'x 384 (5th Cir. 2007). Plaintiff cites no specific incidents or examples of Ryan's and Harrington's demeanor towards her or women generally, let alone any comments made in the context of her job performance, her interview, or the Branch Manager hiring process.[22] *Cf. Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) ("[The] [p]laintiff does not contend that his age was discussed by [the defendant] in the deliberations over [the defendant's] desire to re-hire [the plaintiff], or even by [the defendant] in explaining the decision to [the plaintiff]."); *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 133 (E.D.N.Y. 2012) ("Notably, [the] [p]laintiff provides no examples of specific incidents that caused him to have this 'feeling.'"); *Coats v. Leavitt*, No. 04-CV-7570, 2006 WL 225585, at *4 (S.D.N.Y. Jan. 31, 2006) (finding "conclusory statements, speculation, or general attacks on the defendant's credibility" insufficient to defeat summary judgment); *see also Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25 (2d Cir. 2017) ("[W]hile [the plaintiff] conclusorily alleges . . . that women were treated as second class citizens and were subjected to [a supervisor's] sexist attitudes, she does not cite to any concrete evidence in the record to support the allegations" (citation and internal quotation marks omitted)).[23] And, Plaintiff admitted that she never complained about Ryan's or Harrington's

---

[22] Plaintiff does claim that Ryan and Sinha asked her about why she wanted to start working from the office when she currently worked at home, (Pl.'s Resp. 56.1 ¶ 15), but nothing in that conversation as recounted relates to her gender or characteristics typically associated with gender stereotypes.

[23] Plaintiff did testify that "[w]omen in the office in the office in general were treated as children, [and] they were asked to do menial tasks for [Ryan] so that he wouldn't have to do them," but she provides no specific examples and notes that she never complained to anyone about it. (Pl.'s Dep. 155.) *See Sandman v. Mediamark Research, Inc.*, No. 00-CV-6529, 2002 WL 424660, at *6 (S.D.N.Y. Mar. 18, 2002) (finding "[c]omments about family and discussion about sports," made so frequently "the women could have been invisible" do not establish discrimination (internal quotation marks omitted)). Plaintiff did testify to one gendered comment Ryan made: he said that Dawn, who was in a wheelchair and whom Ryan "did not like

conduct towards women, despite knowing she had a duty to do so under GB policy, (Pl.'s Dep. 161; Def.'s 56.1 ¶ 29), nor did she raise the issue of discrimination with them, (*e.g.*, Pl.'s Dep. 155). *See Lawrence v. Nyack Emergency Physicians, P.C.*, 659 F. Supp. 2d 584, 596 (S.D.N.Y. 2009) (noting that the plaintiff "never complained to [the defendant] about his . . . statements . . . or requested that [the defendant] stop engaging in the conduct which [the] [p]laintiff now claims was offensive and objectionable"), *aff'd sub nom. Lawrence v. Mehlman*, 389 F. App'x 54 (2d Cir. 2010); *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1009 (N.Y. 2004) (noting that the "plaintiff did not complain of . . . discrimination in any forum").

Plaintiff also testified to other preferential treatment of men at GB. (Pl.'s Dep. 162–67.) But, Plaintiff does not connect these instances of alleged mistreatment of women to the decision to hire Harrington over her. The mere fact that the workplace generally was unpleasant for women does not alone make the *failure to promote* Plaintiff actionable gender discrimination. *See, e.g.*, *Reeve v. SEI/Aaron's, Inc.*, No. 06-CV-0642, 2010 WL 2287482, at *6 (W.D.N.Y June 2, 2010) (noting that there was "no nexus between" alleged comments about "the lack of women in management positions" and "the denial of [the plaintiff's] promotions"), *aff'd*, 424 F. App'x 75 (2d Cir. 2011); *see also Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994)

---

dealing with," let "her feminine intuition interfere with her decisions." (Pl.'s Dep. 152–54.) While this comment is inappropriate, it was not directed at Plaintiff, was made years before the Branch Manager hiring process, and Plaintiff provided no context for it such that a fact-finder could reasonably infer discriminatory animus by Ryan sufficient to prove pretext here. *See Daniels v. Connecticut*, No. 12-CV-0093, 2015 WL 4886455, at *13 (D. Conn. Aug. 17, 2015) (concluding that event in which the plaintiff "once heard [a supervisor] joke that men made better officers than women" did not show pretext because of "the weak nexus between this occurrence and any decision related to [the plaintiff's] employment"); *Galimore v. City Univ. of N.Y. Bronx Comm. Coll.*, 641 F. Supp. 2d 269, 286 (S.D.N.Y. 2009) (finding that remarks did not demonstrate pretext because "[t]he comments were not made in connection with the decision-making process, and [were] otherwise not sufficiently pervasive or severe enough . . . to raise a triable issue of fact as to whether [the] [d]efendant's stated reasons for terminating [the] [p]laintiff's employment were pretextual" (footnote omitted)).

(requiring a plaintiff to "demonstrate a nexus between the allegedly discriminatory [actions] and the defendant's decision to [not hire] her," which can be done by showing the discrimination was "directed at the plaintiff, her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff" (citations and quotation omitted)); *cf. Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285, 295 (S.D.N.Y. 2016) (explaining the elements of a hostile work environment claim).  Specifically, Plaintiff claims that two male employees—Adam Strong and Steve Mangold—should have been fired but were not because they were men, and other women were "fired for less."  (Pl.'s Dep. 162–66.)  She does *not* claim that the actions taken with respect to Strong were taken by Ryan, the person who chose not to promote her to Branch Manager, such that they could permit a fact-finder to infer gender bias.  (*Id.* at 162–63.)  As to Mangold, Plaintiff did testify that she and Dawn "sent [a] recommendation for termination to [Ryan] and . . . Plessinger," Ryan's predecessor, because of Mangold's "blatant misconduct," and "they said, well, we're sorry, he's being promoted to supervisor in another branch."  (Pl.'s Dep. 165.)  She does not specify which of them said this, nor does she allege that this decision to promote Mangold was made after they complained about him such that gender bias could be inferred.  Rather, Plaintiff testified only that it must have been discriminatory because the supervisors should have kept Mangold "in a holding pattern" until they resolved the complaint. (*Id.* at 165–66.)  Moreover, Plaintiff also does not provide *any* details regarding what these women did such that a fact-finder could actually determine whether they were in fact fired for "less" egregious conduct.  *See Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 514 (S.D.N.Y. 2010) ("[V]ague claims of differential treatment alone do not suggest discrimination, unless those treated differently are similarly situated in all material respects." (internal quotation marks omitted)).  Indeed, Plaintiff admits she never complained that the treatment of these

women was discriminatory. (Pl.'s Dep. at 167.) Furthermore, Plaintiff testified that she never

heard anyone at GB use "inappropriate language relating to gender." (Pl.'s Dep. 155), and never

saw any documents, emails, or cartoons evincing gender-based animus, (*id.* at 158–59).[24] *See*

*Francis v. Pactiv Corp.*, No. 04-CV-417, 2007 WL 879672, at *13 (E.D.N.Y. Mar. 21, 2007)

(noting that the court may consider "the absence of . . . comments" regarding the plaintiff's

protected characteristics in pretext analysis).

Therefore, because Plaintiff has not raised a dispute of material fact regarding whether

the decision not to hire her as Branch Manager was motivated in part by her gender, the Court

grants Defendant's Motion for Summary Judgment on this claim.

### 2. Unequal Pay

Plaintiff also claims that Defendant knowingly paid her less than other male Claims

Supervisors at GB. (Compl. ¶¶ 29–33; Pl.'s Mem. 16–17.)[25] *See* N.Y. Exec. Law § 296(1)(a)

(prohibiting discrimination "in compensation"). To establish a prima facie case of disparate pay

under the NYSHRL, Plaintiff must show "(1) that [s]he was a member of a protected class; (2)

that [s]he was paid less than similarly situated non-members of h[er] protected class; and (3)

---

[24] Plaintiff did say "yes" in response to a question regarding whether she had ever heard comments from anyone in GB management evincing an animus against women, but the alleged comment was made by a *client*, not anyone at GB. (Pl.'s Dep. 156–58.)

[25] Although the Complaint claimed that Plaintiff was paid less than males in "subordinate positions to her," (Compl. ¶ 30), Plaintiff now argues only that she was paid less than other male Claims Supervisors in Parsippany, (Pl.'s Mem. 16). Thus, to the extent Plaintiff had any claims relating to her salary compared to non-supervisor male employees, they are waived. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) ("[The plaintiff] failed to . . . raise this argument in his opposition to summary judgment. Thus, this argument has been waived.") Moreover, because Defendant argued that any claims relating to Plaintiff's salary while a Claims Representative should be dismissed, (Def.'s Mem. 23 & n.6), and Plaintiff failed to respond to these arguments in her opposition, (Pl.'s Mem. 16–17), such claims are deemed abandoned. *See Simon v. City of New York*, No. 14-CV-8391, 2015 WL 4092389, at *2 (S.D.N.Y. July 6, 2015) (collecting cases holding that a plaintiff abandons claims when it fails to address a defendant's argument on a motion, regardless of its merit).

evidence of discriminatory animus." *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 367 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010); *see also Kassel*, 272 F. Supp. 3d at 535 (noting that the *McDonnel Douglas* test applies to NYSHRL claims).

Plaintiff undisputedly satisfies the first requirement, because she is a woman. However, she has not provided evidence showing that she was paid less than similarly situated male employees. The record shows that several male supervisors were paid more than Plaintiff while she was a Claims Supervisor. (*See* Neigel Decl. ¶ 4 (chart of salaries from 2012–2015).)[26] However, to qualify as comparators, these individuals must be "similarly situated in all material respects" to Plaintiff. *Mandell*, 316 F.3d at 379. Although these men had the same title as Plaintiff, the record is devoid of any evidence regarding their prior experience, either in other branches with GB or at other companies, or their educational backgrounds. *See Caesar v. Riverbay Corp.*, No. 15-CV-8911, 2017 WL 6887597, at *6 (S.D.N.Y. Dec. 27, 2017) ("[The] [p]laintiff cannot demonstrate that he is 'similarly situated in all material respects' to the fellow employees he has named because he has offered no additional information about them. He has not adduced any evidence as to their job duties, responsibilities, assignments, disciplinary records, length of service, salaries, or departmental budgets."); *Wegmann v. Young Adult Inst., Inc.*, No. 15-CV-3815, 2016 WL 827780, at *10 (S.D.N.Y. Mar. 2, 2016) (holding that the plaintiff was not similarly situated to comparators where she did not plead facts about their positions, responsibilities, tenures, or experience); *Asante-Addae v. Sodexo, Inc.*, No. 13-CV-489, 2015 WL 1471927, at *9 (D. Conn. Mar. 31, 2015) (collecting cases holding that the fact that a plaintiff had the same job title as a defendant "is plainly insufficient to establish a disparate

---

[26] Once again, Plaintiff provided no record citations. Indeed, Plaintiff did not even name the other male comparators aside from Strong. (Pl.'s Mem. 16–17.)

pay claim"), *aff'd*, 631 F. App'x 68 (2d Cir. 2016).  Nor does the record show whether different

teams in the Parsippany branch required different skills or managed different workloads, such

that a pay disparity would be justifiable, or whether there were bonus structures in place that

would explain such disparities.  *See Thomas*, 438 F. Supp. 2d at 368 ("Although many share the

title of 'manager,' the employees work in fields within iStar different from [the plaintiff's] and

have different duties and responsibilities."); *Brown v. Northrop Grumman Corp.*, No. 12-CV-

1488, 2014 WL 4175795, at *9 (E.D.N.Y. Aug. 19, 2014) (noting that it is not "dispositive that

[the plaintiff and the defendant] shared the same title and worked in the same department").

Indeed, aside from relying on a chart provided by Defendant to show supervisor salaries from

2012 through 2015, Plaintiff has provided *no* evidence about these comparators, aside from

noting that they are male and that some of them earned more in their first year as supervisors

than Plaintiff did after working for multiple years at GB.  (Pl.'s Counter-56.1 ¶¶ 39, 41, 43, 46;

Pl.'s Mem. 16–17.)  Thus, although cognizant that this question is normally one left to the jury,

the Court concludes that "no reasonable jury could find the similarly situated prong met" here.

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

 Even assuming the identified male supervisors were similarly situated to Plaintiff, her

claim also fails because she has not provided any evidence of discriminatory animus.

Ultimately, Plaintiff's claim amounts to an assertion that she was a woman and earned less than a

man, so that pay disparity must be a product of gender discrimination.  (Pl.'s Mem. 16–17; Pl.'s

Counter-56.1 ¶ 50.)  Indeed, she testified as much with respect to her pay differential with

Strong.  (Pl.'s Dep. 189 ("Q: Just because he's a man and you're a woman?  A: Yes.").)[27]  These

---

[27] Plaintiff also testified that she "s[aw] no other reason" than gender for the pay disparity with Strong, because she was "more qualified than he was," "nobody liked him," and he was "consistently demoted."  (*Id.*at 186.)  However, this testimony was with respect to Strong's

facts are not sufficient to show intentional discrimination based on gender.  *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) ("[The plaintiff] relies on the fact that those employees were paid more than she was and that they are men.  These facts do not support an inference that [the defendant] acted with a discriminatory intent."); *Cox v. Quick & Reilly, Inc.*, 401 F. Supp. 2d 203, 215–16 (N.D.N.Y. 2005) ("[The] [p]laintiff provided no evidence, other than the fact that [a male employee's] compensation was higher than hers, to support her contention that she was paid less because she was a woman. . . . Without evidence that defendants intentionally paid [the] plaintiff less than [that male employee] because she was a woman, no rational jury could find discriminatory intent.").

Indeed, the record shows that Plaintiff was paid less than both male *and* female Claims Supervisors throughout her tenure in that role, (Def.'s 56.1 ¶ 72), belying her claim of discriminatory animus.  *See Capruso v. Hartford Fin. Servs. Grp., Inc.*, No. 01-CV-4250, 2003 WL 1872653, at *5 (S.D.N.Y. Apr. 10, 2003) ("Rather than showing discriminatory animus, th[e] exhibit shows that [the] plaintiff . . . was paid significantly less than all other Staff Attorney II's, both male and female, whether they were more or less experienced than [her].").  Although GB executives raised Plaintiff's salary by $3,000 in 2013 because they noted that her salary was lower than the other supervisors' salaries at Parsippany, (Sussman Aff. Ex. 5; Pl.'s Mem. 16), these emails do not reference gender whatsoever.  Instead, they show that these GB managers agreed to raise Plaintiff's salary by the amount she requested.  (Sussman Aff. Ex. 5.)  That

---

salary as a Claims Representative being higher than Plaintiff's salary in that position.  As discussed above, Plaintiff's claims for that time period were abandoned.  In any event, none of the reasons provided show that their pay disparity was based on Plaintiff's *gender*.  Indeed, when Strong was demoted from Claims Supervisor, his salary was also reduced.  (Def.'s 56.1 ¶ 68.)

Plaintiff believes she should have received a bigger raise does not make this action independently discriminatory. (*Contra* Pl.'s Mem. 16.)

Moreover, it is undisputed that the highest paid Claims Supervisor in Parsippany every year from 2012 through 2015 was female. (Neigel Decl. ¶ 4.) Plaintiff argues that this fact is irrelevant, "because every man earned more than [Plaintiff] did and no reason has been provided by [D]efendant for this." (Pl.'s Mem. 17.) But, this argument presumes Plaintiff has already established her prima facie case; it is *Plaintiff's* burden to show discriminatory intent, not Defendant's burden to show the absence of such intent. *See St. Mary's Honor Ctr.*, 509 U.S. at 511 (holding that the plaintiff "at all times bears the ultimate burden of persuasion" that the decision was intentionally discriminatory (internal quotation marks omitted)). Similarly, to the extent that Plaintiff is troubled by the higher starting salaries given to new male supervisors, females also received higher starting salaries than Plaintiff. (*See* Neigel Decl. ¶ 4 (Maria Basinki started at $80,000 in 2013 and Jamie Chambers started at $80,300 in 2015, while Plaintiff started at $68,000).) The Court therefore grants Defendant's Motion for Summary Judgment on this claim.[28]

### 3. Retaliation

Finally, Plaintiff claims that she was retaliated against, in violation of the NYSHRL, when she received a negative performance review after complaining about not being selected as Branch Manager. (Compl. ¶¶ 17–28; Pl.'s Mem. 15–16.)[29] The NYSHRL prohibits an employer

---

[28] To the extent Plaintiff believes that the voluntary 1.9% salary increase she received in 2015 was independently discriminatory, she has abandoned this claim by failing to address it in her opposition to the Motion. *See Simon*, 2015 WL 4092389, at *2.

[29] To the extent that the record would permit a claim for retaliation from Ryan's and Harrington's behavior towards Plaintiff following this complaint or a claim for constructive

from "discriminat[ing] against any person because . . . she has opposed any practices forbidden under [§ 296]." N.Y. Exec. Law § 296(1)(e). This claim is also analyzed under the *McDonnel Douglas* framework. *See Zann Kwan*, 737 F.3d at 843. To establish a prima facie case of retaliation, Plaintiff must show that:

> (1) [s]he was engaged in a protected activity, *e.g.*, by opposing an unlawful practice; (2) [her] employer was aware of this activity; (3) [s]he suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action (in other words, that a retaliatory motive played a part in the adverse action).

*Apionishev v. Columbia Univ. in City of New York*, No. 09-CV-6471, 2012 WL 208998, at *7 (S.D.N.Y. Jan. 23, 2012).

Defendant argues that Plaintiff did not engage in protected activity because she never complained about alleged discrimination. (Def.'s Mem. 18–20.) Indeed, Plaintiff admits that she never complained. (Pl.'s Dep. 203; Pl.'s Resp. 56.1 ¶ 29.) But, a plaintiff need not formally oppose allegedly discriminatory behavior to satisfy this prong of the prima facie case; rather, "informal protests of discriminatory employment practices, including making complaints to management . . . [and] protesting against discrimination by industry or by society in general" will suffice. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). To that end, Plaintiff argues that her comment to Ryan that she felt she had hit a "glass ceiling" at GB should be construed as a complaint about gender discrimination. (Pl.'s Mem. 15; Def.'s 56.1 ¶ 30.) However, Plaintiff previously testified that, by saying "glass ceiling," she meant that "there were no other opportunities in the claim division" for her to move up now that she did not receive a promotion to Branch Manager. (Pl.'s Dep. 72–73.) She further testified that she *explained to*

---

discharge, Plaintiff has abandoned those claims by failing to address them in opposition to the Motion. *See Simon*, 2015 WL 4092389, at *2.

*Ryan* that is what she meant by "glass ceiling," (*id.* at 73), and that she "did not mention anything about gender" to Ryan, (*id.* at 75; *see also id.* at 169). Thus, although Plaintiff correctly argues that one *could* reasonably interpret "glass ceiling" to refer to the barriers faced by women in the workplace, (Pl.'s Mem. 15), she has testified her way out of this theory by stating that she informed Ryan this is *not* what she meant. Regardless of whether Plaintiff herself believed that "glass ceiling" was a "plain reference" to the Bank Manager decision being discriminatory, (Bucek Aff. ¶ 18), her "undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity," *Aspilaire*, 612 F. Supp. 2d at 309; *see also Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 322–23 (E.D.N.Y. 2014) (noting that "informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by [anti-discrimination] law"); *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 521–22 (S.D.N.Y. 2010) ("When the conduct complained of . . . does not lend itself to a reasonable inference of unlawful discrimination, such 'magic words,' ['discrimination' and 'gender'] may be the only way to put the employer on notice that the employee believes himself to be complaining of discriminatory conduct." (citation omitted)).[30]

Even assuming the "glass ceiling comment" was protected activity and that Plaintiff has proved a prima facie case, she still fails to show pretext. To satisfy this requirement for a retaliation claim under the NYSHRL, "a plaintiff . . . must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)). This showing of "'but-for' causation does not require proof

---

[30] Because Plaintiff failed to satisfy the first prong of the prima facie case, the Court need not reach Defendant's alternative arguments regarding the other prongs—namely, that Plaintiff did not suffer an adverse employment action or establish causation. (Def.'s Mem. 20–21.)

that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action[,] [and] [f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*

As discussed above, Defendant provided a legitimate, non-discriminatory basis for the negative performance review: Plaintiff's team was not meeting its Toolkit goals and Plaintiff needed to hold her staff accountable. (2014 Performance Review; Def.'s Mem. 21–22.) Plaintiff disputes this reasoning, again arguing that she previously told Ryan her unit was under-staffed and he was slow to respond. (Pl.'s Mem. 15–16.) However, that Plaintiff disagrees with her performance rating because she thinks the Toolkit factor was overemphasized does not show that reliance on the Toolkit was a *pretext for retaliation* for her comment about the "glass ceiling." (*See* Def.'s 56.1 ¶ 41.) Indeed, Plaintiff admits that, prior to the performance review, Ryan discussed the Toolkit issues, which were "of the utmost importance," to him, with her, and her "team's [T]oolkit was not looking really good." (Def.'s 56.1 ¶ 40; Pl.'s Dep. 82, 92.) She also testified that keeping the Toolkit green was a "goal" and "best practice[]" at GB. (Pl.'s Dep. 47, 61.) Indeed, even in her written responses to the performance review, Plaintiff noted that her team is "still trying to balance out the new claim distribution," and she listed "[a]ssist team in achieving 'Green' status in most categories on a regular basis" as a short-term goal for the future (2014 Performance review 3–4.) And, Ryan acknowledged in the performance review that Plaintiff's team was facing staffing issues. (*Id.* at 2.) Yet, the performance review was partially positive about Plaintiff's work performance, noting that her "clients have offered many positive

comments" and that she "is a valuable member of the management team in Parsippany." (*Id.* at 1–2.) Thus, while Plaintiff may believe overreliance on the Toolkit was unfair in light of her understaffing issues, she has conceded its truth, and thus has not created a genuine dispute of material fact regarding whether the Toolkit analysis was inconsistent, contradictory, illegitimate, or implausible. *See Zann Kwan*, 737 F.3d at 846 (permitting a plaintiff to prove causation "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action"); *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 30 (E.D.N.Y. 2015) ("Where . . . the reasons given for [the] [p]laintiff's termination are well documented, non-discriminatory, and [the] [p]laintiff concedes that these incidents occurred, her rationalizations and explanations are insufficient to show that [gender] was the but-for cause of her termination."); *Butts v. New York City Dep't of Hous. Pres. and Dev.*, No. 00-CV-6307, 2007 WL 259937, at *19 (S.D.N.Y. Jan. 29, 2007) ("Although [the] [p]laintiff disagrees with her superiors' evaluation of her work, there is simply no evidence that their decision was based on retaliatory animus. [The] [p]laintiff's own statements that this refusal must have been the result of discrimination are insufficient."), *aff'd*, 307 F. App'x 596 (2d Cir. 2009); *see also Markovich v. City of New York,* 588 F. App'x. 76, 77 (2d Cir. 2015) ("While [the plaintiff] established a prima facie case of discrimination, he did not dispute the accuracy of the observations reported in his negative performance reviews.").

Plaintiff also notes that the performance review occurred "[w]ithin a month" of Plaintiff making the "glass ceiling" comment to Ryan. (Pl.'s Mem. 15.) However, "without more, such temporal proximity is insufficient to satisfy [Plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *see also Forrest*, 819 N.E.2d at 1013 ("Nor can [the] plaintiff avoid summary judgment by merely pointing to the

inference of causality resulting from the sequence in time of the events." (internal quotation marks omitted)); *Gurry v. Merck & Co.*, No. 01-CV-5659, 2003 WL 1878414, at *7 (S.D.N.Y. Apr. 14, 2003) (granting summary judgment on retaliatory discharge claim where the plaintiff relied only "on her prima facie proof, based solely on timing"). Plaintiff does not cite to *any* other evidence of retaliatory animus. (Pl.'s Mem. 15–16.)[31] Because Plaintiff has failed to rebut Defendant's reasons for her negative performance review or to present any additional evidence of pretext, the Court grants Defendant's Motion for Summary Judgment on the retaliation claim.

---

[31] The Court notes that, when asked for "every fact" that supported her retaliation claim, Plaintiff testified: "The fact that I raised the issue with [Ryan] . . . my concerns about the glass ceiling and my concerns about my employment and not having a clear career track went against the grain with him." (Pl.'s Dep. 168; *see also* Pl.'s Dep. 107 (testifying that her "concerns about not being promoted [and] . . . about the glass ceiling . . . changed the relationship that she had with [Ryan]"); *id.* at 135 ("I felt that my performance rating would have been different had I not had the conversation with [Ryan] about the glass ceiling.").) These conclusory statements, without any factual basis, are insufficient to show that her "glass ceiling" comment was the but-for cause of her negative performance review. *See Ghirardelli v. McAvey Sales & Serv., Inc.*, 287 F. Supp. 2d 379, 391 (S.D.N.Y. 2003) (finding that the plaintiff failed to show pretext because she offered "no other evidence on the record, such as testimony of a third party or written documents," that could support an inference of retaliation and instead relied on her own "speculation, conjecture, and self-serving conclusions"), *aff'd*, 98 F. App'x 909 (2d Cir. 2004); *see also Cunningham v. New York State Dep't of Labor*, 429 F. App'x 17, 19 (2d Cir. 2011) (affirming summary judgment on retaliation claim "because [the plaintiff] offers nothing more than his own conclusory allegations to challenge [the defendant's legitimate, non-retaliatory] reason or meet his ultimate burden of proving retaliation"). This conclusion applies equally to Plaintiff's supposition on the recorded call with Negiel that she had "no idea" whether they were "railroading" her because she is "a woman," because "they don't like the way [she] interact[s] with people," or because it is "retaliatory for something [she's] done." (Neigel Call at 3:10–3:32.)

44

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 22), enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:     March 29, 2018
               White Plains, New York

                                              KENNETH M. KARAS
                                            UNITED STATES DISTRICT JUDGE